# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| H CONTRACTORS, LLC, )<br>      Plaintiff, )<br>)<br>v. )<br>)<br>E.J.H. CONSTRUCTION, INC., )<br>      Defendant. )<br>)<br>_____)<br>)<br>E.J.H. CONSTRUCTION, INC., )<br>      Third-Party Plaintiff, )<br>)<br>v. )<br>)<br>Treepoint, LLC d/b/a/ D HOSPITALITY, )<br>      Third-Party Defendant. ) | Civil Action No. 16-368<br><br>Magistrate Judge Lenihan<br><br>ECF No. 85 |

## MEMORANDUM OPINION

Presently before the Court is the Motion for Summary Judgment filed by Third-Party Plaintiff E.J.H. Construction, Inc. (EJH) against Third-Party Defendant Treepoint, LLC d/b/a D Hospitality (D Hospitality) (ECF No. 85). For the reasons discussed below, the Motion will be denied.

I.    RELEVANT FACTS

The following facts are taken from the parties' Concise Statement of Material Facts and Response in Opposition and are undisputed unless otherwise indicated. (ECF Nos. 86 & 98.)

This civil action concerns four hotels (the "Four Hotels") that were undergoing various renovations and other improvements (the "Project") (ECF Nos. 86 & 98 ¶ 1.) Third-Party Plaintiff E.J.H. Construction, Inc. ("EJH" or "Plaintiff") is a full-service general contractor engaged in the business of commercial construction and renovation, disaster mitigation, and

disaster restoration.  Third-Party Defendant Treepoint, LLC d/b/a D Hospitality ("DH" or "Defendant") procures and provides furniture, fixtures, or other equipment ("FF&E") to the hotel industry.  At all relevant times, Dae Oh served as the CEO and Principal, and Jonathan Telfer served as one of the "three main people" at DH.  (ECF Nos. 86 & 98 ¶ 3.)

West Penn Hotels ("West Penn") was the owner of the Four Hotels.  Horizon Hotels Ltd. ("Horizon") was the owner's representative for the Four Hotels.  An owner's representative is trusted by the owner to be on the properties, review and evaluate the work being done, and ensure that the drawings and plans are being followed by those performing the work.     DH was retained by West Penn for FF&E.  (ECF Nos. 86 & 98 ¶ 6.)  JMAC was the architect for the Projects hired by West Penn.  H Contractors, LLC ("HC") was a subcontractor for EJH.  HC began work in July of 2015.  (ECF Nos. 86 & 98 ¶ 8.)

In January of 2015, DH entered into an agreement with West Penn.  (ECF Nos. 86 & 98 ¶ 9.)  At Article 1, Section 1.1, the Agreement provides as follows:

> 1.1    Contractor shall provide the services and construct and/or provide, as the case may be, the work identified in Exhibit "A" ("Work") using the items identified in Exhibit "B" ("Materials") in accordance with the Contract Documents, as identified in Article 8 of this Agreement, with all Work to be conducted at the Properties.  It is agreed and understood that except where indicated, each item of Work or Materials shall be provided at each of the Properties.  The Work will be completed in two phases with Phase One to include all Work to occur in the public areas at the Properties and Phase Two to include all Work to occur in the guest rooms and corridors.

(ECF No. 87 at 138.)

The Project at the Four Hotels consisted of two phases of work.  During "Phase I" of the Project, the public areas of each of the Four Hotels—lobby, dining area, bar, meeting rooms and board rooms—would be demolished and repaired/rebuilt.  During "Phase II" of the Project, the

2

guest rooms and adjacent corridors would be demolished and repaired/rebuilt. (ECF Nos. 86 & 98 ¶ 10.) In exchange for this work, West Penn agreed to pay DH $2,300,000 for Phase One and $6,423,833 for Phase Two, although DH states that it was never paid these sums. (ECF Nos. 86 & 98 ¶ 11.) This agreement was signed by DH on December 18, 2014, and by West Penn on January 6, 2015. (ECF Nos. 86 & 98 ¶ 12.) The work and materials associated with the two phases were to be accordance with "Brand Carlson Specifications." Carlson was the parent company of Radisson, the brand under which the Four Hotels were being operated. (ECF Nos. 86 & 98 ¶ 13.) Pursuant to the agreement between DH and West Penn, DH was to complete all work on or before March 20, 2015. (ECF Nos. 86 & 98 ¶ 14.) The Project was not completed by that date, and the record reflects that no formal written extension was entered into by DH and West Penn, although it is undisputed that the Project continued after March 20, 2015. (ECF Nos. 86 & 98 ¶ 15.)

DH is not a general contractor or a construction company. Instead, it was the intention of West Penn and DH for a contractor to be retained to perform the construction work for the Project. DH contends that it did not hire the contractor but that West Penn had the ultimate authority for hiring the contractor. (ECF Nos. 86 & 98 ¶ 16.) A contractor named MOD Construction ("MOD") began work on the project around December 2014. Again, DH denies that it hired MOD, but that West Penn retained MOD. (ECF Nos. 86 & 98 ¶ 17.)

MOD agreed to perform and complete the work associated with Phase I of the Project in exchange for "around $750,000." (ECF Nos. 86 & 98 ¶ 18.) The parties agree that MOD did not complete its work. The parties dispute, however, the percentage of work it did complete. MOD was paid for all of the work that it performed, and was owed no additional monies. (ECF Nos. 86 & 98 ¶ 20.)

Following MOD's departure, it was obvious that the work had fallen behind schedule. The parties dispute whether there was great urgency from DH, West Penn and Horizon to resume work. (ECF Nos. 86 & 98 ¶ 21.) Dae Oh, CEO of DH, testified that urgency is common in the industry, and there was no more urgency to get EJH on the site than is typical in the industry. (Oh Dep., Part II at 29.)

Around May 2015, DH and EJH discussed the possibility of EJH taking over the renovation and remodeling work that was originally being performed by MOD. (ECF Nos. 86 & 98 ¶ 22.) EJH traveled to the Four Hotels and conducted a tour. Representatives of EJH testified that the Four Hotels were "a mess" and in "disarray"—the work to that point was incomplete and substandard in quality. (ECF Nos. 86 & 98 ¶ 23.) Both West Penn and Horizon were dissatisfied with the work conducted by MOD and knew that some work would have to be redone. (ECF Nos. 86 & 98 ¶ 25.)

Later in May of 2015, DH, EJH, West Penn, Horizon and JMAC came together for a meeting at one of the Four Hotels prior to EJH doing any work on the Four Hotels. The Project was discussed. No contract or financial discussions were held during this meeting. (ECF Nos. 86 & 98 ¶ 26.) The discussions focused on Phase I; Phase II would be discussed later. (ECF Nos. 86 & 98 ¶ 27.)

The parties agree that DH verbally offered Phase I work to EJH. (ECF Nos. 86 & 98 ¶ 28.) Dae Oh testified that he and Kieth Pruett, Executive V.P. of EJH, met at one of the sites and Dae Oh offered Pruett the remainder of the contract DH had with MOD. Dae Oh testified that he was offering 30 to 40 percent of that contract to EJH because he believed that MOD had completed 60 to 70 percent of the work. (Dep. of Dae Oh, Part I at 102-103.) However, after EJH conducted an onside review of the Four Hotels, and after EJH spoke with Horizon, EJH

4

concluded that DH's belief concerning the remaining contract value with MOD was not valid. DH's representations as to the remaining scope of work did not match the actual site conditions, and thus DH's offer would not suffice. Per EJH, additional work, and thus additional money, was needed to complete Phase I. (ECF Nos. 86 & 98 ¶ 29.)

The parties dispute whether Exhibit 9 (ECF No. 19-1 at 2-37) (Draft Contract for all Hotels) was a template or proposed contract to EJH, or that it was a standard contract that DH used for its projects. Dae Oh indicated in deposition that DH has a standard subcontract agreement that it uses for its projects and that he presented it as a Word document to Keith Pruett, but that it did not look like Exhibit 9. He also testified that the overall template looks like DH's, but that it was clear that Exhibit 9 was not produced by DH. Dae Oh further testified that Exhibit B was not produced by DH. (Dep. of Dae Oh, Part I at 127-131.) The parties dispute whether Exhibit 9 was a proposed contract between DH and EJH. (ECF Nos. 86 & 98 ¶ 31.) Moreover, the parties dispute whether Exhibit B to Exhibit 9 defines the scope of work being offered to EJH. (ECF Nos. 86 & 98 ¶ 32.) Instead, it establishes the original scope of the work, or Performance Improvement Plan ("PIP") for Phase I and Phase II prior to any work being completed by any of the contractors that worked on the Project before EJH. (K. Pruett Dep. at 77-80.) Since the PIP outlined the complete work for Phase I and Phase II, and since there were discrepancies between DH's assessment of the work completed by MOD versus EJH's onsite tour, EJH prepared a document entitled "Clarification and Qualification" and a schedule of values for each of the Four Hotels. The parties dispute whether DH and EJH agreed to the "Clarifications and Qualifications" and schedule of values (identification of a particular item within the scope of work and the cost associated with that particular item) for each of the Four Hotels or whether they were accurate. (ECF Nos. 86 & 98 ¶¶ 33-34.) DH disputes the amounts

5

presented by EJH for the costs of the work for each of the Four Hotels or that DH ever agreed to these amounts. (ECF Nos. 86 & 98 ¶ 35.) The parties dispute that there was a "proposed" contract between EJH and DH. DH contends that it never signed documents that were prepared by EJH. (ECF Nos. 86 & 98 ¶ 36.)

EJH contends that pursuant to the terms of the document it signed, it would invoice DH biweekly based upon the percentage completed at the time of each invoice. DH denies that the invoices were sent on a biweekly basis and that EJH cannot point to any invoice. (ECF Nos. 86 & 98 ¶ 37.) EJH acknowledges that DH never signed the document that EJH signed, but EJH continued its work. DH indicates that EJH sent the document on July 31, 2015 and EJH stopped work on August 9, 2015. (ECF Nos. 86 & 98 ¶ 38.) EJH explains that while it commenced its work at the Four Hotels on or around June 22, 2015, it did not forward the proposed contracts to DH until July 31, 2015. Pruett, the Senior Project Manager, explained that this gap in time was due to the conflict between DH's representations of the work completed by MOD versus the actual work performed by MOD. Due to this discrepancy, it took time for EJH to determine and verify the work needed to complete Phase I and the costs for that work. ((ECF Nos. 86 & 98 ¶ 36 &n.11.)

EJH contends that it made demands for payment in early to mid-July of 2015 and that via emails, DH advised representatives of ownership that EJH needed payment and could not wait any longer. A few days thereafter, DH advised EJH, via email, that it attempted to secure payment for EJH. DH denies these assertions and indicates that the emails reflect DH's attempts to get money to EJH for the other job on which DH and EJH were working with the same ownership group. DH states that within days of receiving a large wire transfer, EJH stopped work. (ECF Nos. 86 & 98 ¶ 39.)

EJH submitted pay applications on or around August 12, 2015, approximately two weeks after signing the proposed contracts and sending those proposed contracts to DH. DH admits that EJH prepared pay applications dated August 12, 2015, but contends that they were improper and inaccurate. DH states that they were not signed by EJH and that the record does not establish to whom the pay applications were sent. DH also notes that the pay applications were provided after EJH had stopped work on the project and that the record does not establish that EJH performed the work stated in the applications. Pruett testified that he had no idea what work had been completed as of July 31, 2015, his last day with EJH. Kosorski, EJH project manager/supervisor testified he did not know what work had been completed when EJH left the job. Shollar, a partner of the Owner West Penn, testified that he prepared an affidavit in which he stated that EJH completed approximately 20% of the work, and Olcott, the owner's representative at the site, agreed. (ECF Nos. 86 & 98 ¶ 40.)

In the deposition of John Hale, principal of EJH, he admits that no one at DH represented to him personally that the contract would be signed upon beginning the construction and EJH would be paid according to the unsigned contract terms. Instead, Hale testified that, to the best of his knowledge, Pruett "would have told me that." Hale continued that it "would be very uncommon not to have a contract" and "payment terms would need to be established," . . . "so it would have more than likely come from Mr. Pruett." (Hale Dep. at 55.) Pruett testified that "I do not believe we would have started work without an LOI [Letter of Intent] or an executed contract." (Pruett Dep. at 88.)

II. LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to

interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non- movant's burden of proof. *Id*. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

III.  ANALYSIS

A.  EJH'S MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF IMPLIED CONTRACT-IN-FACT and on DH'S COUNTERCLAIM FOR BREACH OF ORAL CONTRACT

EJH argues that an implied-in-fact contract had been formed between EJH and DH wherein EJH agreed to provide renovation and remodeling services at the Four Hotels in exchange for payment. EJH continues that DH refused to make any payments to EJH and so EJH left the Project. DH responds that the record does not reflect a meeting of the minds regarding the scope of the work to be performed or the amount to be paid. Instead, the record reflects negotiations that were never concluded.

Under Pennsylvania law, "[a] contract implied-in-fact is an actual contract arising when there is an agreement, but the parties' intentions are inferred from their conduct in light of the circumstances." *Birchwood Lakes Comm. Ass'n, Inc. v. Comis*, 442 A.2d 304, 308 (Pa. Super. Ct. 1982) (citing *Elias v. Elias*, 237 A.2d 215 (Pa. 1968) (other citations omitted)). Intent in a contract-in-fact is to be ascertained and enforced, and the duties of the parties will be defined by the contract that is legitimately inferred. *Hertzog v. Hertzog*, 29 Pa. 465, 465 (1857), *quoted in, Curley v. Allstate Ins. Co.*, 289 F. Supp.2d 614, 620 (E.D. Pa. 2003).

Here, EJH's motion for summary judgment on its claim for breach of contract-in-fact and its motion for summary judgment on DH's counterclaim must be denied. The record reflects disputed issues of material fact as to whether these parties are bound by a contract-in-fact.

First, the parties agree that there is a disputed issue of fact as to the value of the work performed by MOD. The dispute as to the value of MOD's work was critical to the determination of the remaining work to be completed by EJH. Based on its assessment of the value of MOD's work, DH appears to have made an offer to EJH for work at the Four Hotels. The record reflects that EJH approved the Project around June 19, 2015. EJH, believing that it needed to mobilize quickly, began work sometime around June 22, 2015. DH indicated that

9

urgency is common in the industry, but it disputes that discussions regarding immediate mobilization were had before work began.

The record further reflects that after inspecting the work sites and finding them in complete "disarray," EJH determined that it could not work for the contract price originally offered by DH. Yet, EJH worked on the Project after making this determination. Thereafter, EJH prepared tables for the values it believed were necessary to complete Phase I, and attached them to a proposed contract signed by EJH on what appears to be DH letterhead. DH disputes that it prepared this document and contends that it was prepared by EJH using a Word document it received from DH, and that the attached value tables were prepared by EJH as well. These values were not communicated by EJH to DH until July 31, 2015. Importantly, the record reflects disputed issues of material fact as to whether DH agreed to the new values proposed by EJH. The record does not reflect that DH signed the proposed July 31, 2015 contract with the attached revised values. Eight days later, on August 8, 2015, EJH dismantled and left the job site.

Clearly, the record reflects numerous disputed issues of material fact as to what the parties intended as inferred from their conduct in light of the circumstances. Therefore, summary judgment must be denied on EJH's claim for implied contract-in-fact. In addition, EJH's Motion for Summary Judgment as it pertains to DH's counterclaim against it must be denied for the same reasons.

B.   UNJUST ENRICHMENT

EJH argues that DH has been unjustly enriched because it received the benefit of EJH's work at the Four Hotels without any payment to EJH. DH responds that the record does not reflect what work EJH performed or the value of any work it performed.

The vehicle for achieving restitution as a result of unjust enrichment is a quasi-contract, or contract implied in law. *Martin v. Little, Brown & Co.*, 450 A.2d 984, 988 (Pa. Super. Ct. 1981). "'Unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice." *Id.* (citing *Schott v. Westinghouse Electric Corp.*, 259 A.2d 443, 449 (1969) (quoting Restatement (Second) of Contracts, § 5, comment b. at 24.)) "To sustain a claim of unjust enrichment, it must be shown by the facts . . . that a person wrongly secured or passively received a benefit that it would be unconscionable to retain." *Id.* (citing *Brereton Estate*, 130 A.2d 453, 457 (Pa. 1957) (other citations omitted)).

Here, disputed issues of material fact prohibit this Court from granting summary judgment on the claim of unjust enrichment. This record is replete with issues of material fact as to whether it was appropriate for EJH to work on the Project when it determined that DH's terms were unacceptable to EJH. Instead, EJH continued working on the Project and only informed DH of what EJH perceived to be acceptable terms by email on July 31, 2015. In addition to the dispute regarding the amount of work needed to complete the project after MOD dismantled, the parties dispute the adequacy and value of the work performed. In light of the disputed issues of fact, the Court is unable to decide as a matter of law a "just" result on this issue. Therefore, EJH's Motion for Summary Judgment on this issue will be denied.

C.  PENNSYLVANIA CONTRACTOR AND SUBCONTRACTOR PAYMENT ACT

EJH contends that it is entitled to judgment as a matter of law on its claim pursuant to the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. §§ 501-516. DH responds that in the absence of a contract, CASPA does not apply.

11

As noted by DH, the Pennsylvania Superior Court indicated the following regarding CASPA:

> By its terms, CASPA applies to construction contracts. 73 P.S. § 515. One must first establish a contractual right to payment pursuant to either a written or oral contract, and breach of that contract, to be entitled to CASPA relief. . . . Thus, the construction contract is the starting point of any CASPA analysis. CASPA does not supplant the traditional breach of contract action between contracting parties; it merely makes additional remedies available to contractors and subcontractors when they are not promptly paid by the party with which they contracted.

*Scungio Borst & Assocs. v. 410 Shurs Lane Developers, LLC*, 106 A.2d 103, 109 (Pa. Super. Ct. 2014).

In light of this Courts analysis at Part III. A, *supra*, finding disputed issues of material fact on the issue of a contract implied-in-fact, the Court must likewise deny summary judgment on Plaintiff's claim pursuant to CASPA.

D.   CONTRIBUTION AND INDEMNITY FOR PAYMENTS TO H CONTRACTORS

EJH moves for summary judgment on its claim for contribution and indemnity from DH. EJH states that as a consequence of its payment to H Contractors for the work it performed at the Four Hotels, DH owes those monies paid to EJH. DH responds that EJH and DH are not joint tortfeasors, and Pennsylvania law only authorizes contribution among joint tortfeasors. In addition, DH argues that the right to indemnity is contractual and arises when a person not actively at fault has been compelled by a legal obligation to pay damages.

Here, because disputed issues of material fact exist as to DH's liability to EJH, summary judgment on this issue is inappropriate.

E.   PROMISSORY ESTOPPEL

In support of its Motion for Summary Judgment on its claim of promissory estoppel, EJH argues that DH made representations and promises to make payment for work and services EJH provided to the Four Hotels, and that EJH detrimentally relied upon those promises when it began work on the Project. DH responds that EJH admitted that it rejected DH's assessment of the state of the project, and that EJH demanded more money to complete Phase I of the Project than had been offered by DH, and therefore, EJH did not rely on DH's promise.

In discussing the statute of limitations applicable to a claim for promissory estoppel, the Pennsylvania Supreme Court described the cause of action as follows:

> Where there is no enforceable agreement between the parties because the agreement is not supported by consideration, the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment. Restatement (Second) Contracts § 90; *see, e.g., Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. 1997). In order to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promise; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only be enforcing the promise. As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute.

*Crouse v. Cyclops Indus.,* 745 A.2d 606, 610 (Pa. 2000).

Again, the record reflects disputed issues of fact as to whether EJH relied on DH's promise. Record evidence reflects a series of negotiations and EJH's counter proposals to DH indicating that DH's original offer was insufficient to perform the necessary work. EJH admitted that it rejected DH's assessment of the state of the Project and mobilized anyway. Moreover, the record reflects a material issue of fact as to whether immediate mobilization was discussed at the

13

time EJH began work on the Project. Therefore, summary judgment will be denied on this claim.

F.     FRAUDULENT INDUCEMENT

EJH argues that DH fraudulently represented to EJH that it would sign the contracts once EJH began work. DH responds that the record reflects no evidence of fraudulent inducement.

In order to state a claim for fraudulent inducement, a plaintiff must show the following:

> "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Skurnowicz* [*v. Lucci*], 798 A.2d [788,] [] 793 [(Pa. Super. Ct. 2002)], quoting [] *Bortz v. Noon*, [] 729 A.2d 555, 560 (1999)."

*Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005).

Again, the record reflects material issues of fact as to whether DH made representations to EJH knowing they were false or with recklessness as to whether they were true or false, with the intent of misleading EJH into relying upon those representations. Therefore, summary judgment on this issue must be denied.

IV.    CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment filed by Third-Party Plaintiff E.J.H. Construction, Inc. against Third-Party Defendant Treepoint, LLC d/b/a D Hospitality (ECF No. 85) will be denied.

An appropriate Order will follow.

14

March 29, 2019

                                              BY THE COURT

                                              _____
                                              LISA PUPO LENIHAN
                                              United States Magistrate Judge